### WILLIAM PALMISANO v. STATE.
No. A-4692.    Opinion Filed Dec. 10, 1924.
(230 Pac. 944.)

(Syllabus.)

**Larceny—Evidence Insufficient to Show Felonious Taking of Automobile.** In a prosecution for larceny of an automobile, evidence held insufficient to show a felonious taking.

Appeal from District Court, Ottawa County; J. J. Smith, Judge.

William Palmisano was convicted of larceny and he appeals. Reversed.

D. H. Cotten, for plaintiff in error.

The Attorney General, for the State.

DOYLE, J.    Plaintiff in error, William Palmisano, was convicted, and in accordance with the verdict of the jury he was sentenced to serve a term of five years' imprisonment in

the penitentiary upon an information charging the theft of an Overland automobile, 1921 model, from the owner, Albert Cole. From such conviction and judgment rendered, February 10, 1923, he appeals.

Plaintiff in error is not represented by counsel in this court and no brief in support of the assignments of error has been filed.

Upon an examination of the record we have reached the conclusion that the judgment should be reversed. The undisputed facts are that on the 2d day of April, 1923, plaintiff in error and one Frank Thieman left Commerce, Okla., and went to Pittsburg, Kan., there to the home of Albert Cole, owner of the alleged stolen automobile; that evening they returned to Commerce in the automobile in question. The next morning plaintiff in error was arrested at the home of his mother in Commerce where he was fixing a tag on the car.

The conviction is based upon the testimony of Albert Cole given upon the preliminary examination and read from the transcript of his testimony by W. J. Farneman, the court reporter, from a transcript of the evidence as taken by him on the preliminary examination. Albert Cole testified:

"I live at 811 E. Eighth st., Pittsburg, Kan.; I kept my car at 710 E. Ninth st.; the defendant came to my house with Frank Thieman and they were there maybe two hours; they had supper there, I missed my car the next morning about nine o'clock and Monday at noon I was called up and told it had been found. I had a conversation with Mr. Thieman about the car 10 days or 2 weeks before that."

He then testified as follows:

"Q. What was the substance of the conversation you had with Thieman? A. Well, sir, he asked me if he could take the car—use the car to drive down in Oklahoma somewhere, I

don't know whether it was Sapulpa or Okmulgee, one of the two places. He said he was going down in the oil fields to look for a job and he asked me if I would let him use the car. I says, 'It is just like this Frank, there is no license on it and if you will get a license you can use it if you will take care of it.'

"Q. Was there any date or arrangements made about when he should get the car, what was said about that? A. I asked him when he was going to take it up, and he said he wasn't ready to go yet. He said 'I will want it some time, but I don't know when.' And I says, 'Any time you want to use it, it will be all right, if you will get a license for it.'

"Q. Then when he came in Saturday night, did he say anything about this car? A. No, sir.

"Q. Have you talked to him since that time? A. Yes, sir."

Cross-examination:

"Q. I will ask you if it is not a fact that Thieman claimed to be a brother-in-law of yours? A. Well, not to me; but I have heard that it has been claimed; yes, sir.

"Q. Isn't it a fact that he has been living up here in this county, at Commerce or at Picher with a sister-in-law of yours? A. Well, I couldn't swear to that, but that is what he has told me himself.

"Q. Do you know where he is at this time? A. No, sir.

"Q. The complaint charged Thieman with the theft of this car the same as Palmisano? A. Yes, sir.

"Q. You made the complaint? A. Yes, sir.

"Q. Thieman had loaned you some money that you used in making payments on this car? A. Yes, sir.

"Q. What amount was that? A. Fifty dollars, it was to make the February and March payments; the monthly payments were $25.

"Q. I believe you stated that you told him he could have the car when he talked with you about it? A. Yes, sir.

"Q. You and he had been rather friendly and intimate, had you not? A. Yes, sir.

"Q. He and Palmisano came to your house on this Saturday night? A. Yes, sir.

"Q. Did the three of you go to town together? A. Yes, sir.

"Q. Where did you leave them? A. Well, I left them on the corner of Fourth and Broadway, where the Salvation Army man was talking.

"Q. Now, when you talked with him or when he talked with you about using this car, there was some talk between you and he about him not knowing very well how to drive it? A. Yes, sir.

"Q. He told you he would get some one to go with him to drive the car? A. Yes, sir.

"Q. Of course, you told him if he was going to drive the car and use it he would have to see about the license? A. Yes, sir.

"Q. Was there any talk between you as to whether it should have an Oklahoma license or Kansas? A. Well, no talk only he was to get the license. I suppose it would have been Kansas license though.

"Q. You do not of your own knowledge know whether this man Thieman had any talk with your wife about this matter or not? A. I don't know.

"Q. In view of the conversation you had with Thieman about his using the car, if he had have asked you for the car that evening you would have told him he could have taken it, wouldn't you? A. Yes, sir.

"Q. When you missed the car what did you do? A. I went out to the garage and the people I rent from told me that a man by the name of Grooms stayed there a few days,

and had told them he was going to take the car the first chance he got. I believe Punk Grooms, he said he is gone. I went down to the police station, and took this man with me and he told the chief of police this, and I supposed that was where the car was at.

"Q. You suppose then this man they called Grooms was the one that had stolen the car? A. Yes, sir.

"Q. You had no idea about your friend Thieman taking it or you would not have seen the law, would you? A. No, sir."

George O. Gibson, deputy sheriff, testified:

That he saw the plaintiff in error at Commerce, Okla., fooling with this car; there was a license applied for tag on the car. "I told him to come down and I would look over my files, I thought I had the number of this car as a stolen car. The next day Palmisano said that he and a fellow called Dutch (he did not know his other name) had been staying at Picher and the day before Dutch had hired him to go to Pittsburg with him and to drive the car back; they ate supper with this man that owned the car and he drove the car back for Dutch; I called up Joplin police station and asked them if they knew of any stolen Overland car, and gave the license number and the engine number; they told me a car of that description had been stolen the night before at Pittsburg, Kan., then I held him, and notified the chief of police of Pittsburg."

At the close of the state's evidence counsel for the defendant moved for a directed verdict of acquittal in the form of a demurrer to the evidence, which was overruled and exception allowed.

As a witness in his own behalf plaintiff in error testified that he lived at Commerce with his mother; that Frank Thieman told him his brother-in-law was going to loan him an Overland car, which he himself had an interest in, to drive down to Oklahoma, and he wanted to learn how to shift the gears; that he told him if he would give $3 and pay his ex-

penses he would go with him and show him how to shift the gears; that Dutch agreed to that and they went to Pittsburg and had supper at his brother-in-law's, after that all three went down town; then they went back to the house and he told them he would wait for them, they came back about 9 o'clock and Thieman said, "Are you ready to go?" and he said, "Any time you are." They went to the garage and he backed the car out. On the way back they stopped at Picher where Dutch's wife was supposed to be and he did not find her and he told Dutch "I will put the car in the garage and you can get your wife and meet me at Commerce." Thieman said that he was going up to Picher to get his wife, and get his suit case so we could make the trip on down to Sapulpa. After he left George Gibson, deputy sheriff, came to the garage.

It needs no argument to show that the evidence in this case is insufficient to show a felonious taking of the alleged stolen automobile in the state of Kansas, or a felonious possession of the same by the plaintiff in error in Ottawa county. There can be no larceny where a person takes the property of another with the consent of the owner. Here the owner testifies that he had given permission to Frank Thieman to take the automobile to Oklahoma and permitting him to have some person go with him to drive the car, and there is no evidence tending to show that said owner was induced to part with his possession of the automobile by fraud or false pretense. In our opinion there is no evidence upon which the jury could base a finding that the plaintiff in error's possession of the automobile in question in this state was felonious. Such being the state of the evidence a legal conviction was impossible. It follows that the court should have sustained the motion for a directed verdict of acquittal.

The judgment of the court below is accordingly reversed. The record shows that plaintiff in error was committed to the

penitentiary on the 25th day of February, 1923. If this fact had been called to the attention of the court when the appeal was filed, the case would have been advanced and assigned for submission at the following term of this court.

The warden of the penitentiary will surrender the plaintiff in error to the custody of the sheriff of Ottawa county, who will keep him in custody until discharged therefrom according to law. Mandate forthwith.

MATSON, P. J., and BESSEY, J., concur.